**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SANDY LODERMEIR, Individually and On Behalf of All Others Similarly Situated, | )<br>) **08 CIV 4456** (WHP)<br>)<br>) CIVIL ACTION NO. |
| Plaintiff, | )<br>)<br>) |
| vs. | )<br>) CLASS ACTION COMPLAINT<br>) |
| AGRIA CORPORATION, GUANGLIN LAI, KENNETH HUA HUANG, GARY KIM TING YEUNG, ZHAOHUA QIAN, ZHIXIN XUE, GEOFFREY DUYK, TERRY MCCARTHY, JASMINE MARRERO, CREDIT SUISSE SECURITIES (USA) LLC, HSBC SECURITIES (USA) INC., PIPER JAFFRAY & CO., CIBC WORLD MARKETS CORP. and BROTHERS CAPITAL LIMITED, | )<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>) ECF CASE<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiff, Sandy Lodermeir ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Agria Corporation ("Agria" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of the securities of Agria, who purchased or otherwise acquired Agria's securities pursuant to and/or traceable to the

Company's November 6, 2007 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.    Agria engages in the research and development, production, and sale of upstream agricultural products in the People's Republic of China. The Company offers corn seeds, sheep breeding products and seedling products to distributors.

3.    On November 6, 2007, the Company conducted its IPO. In connection with its IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC. The IPO was a financial success for the Company and its selling shareholder, Brothers Capital Limited, as they raised over $282 million by selling 17,150,000 of the Company's securities to investors at a price of $16.50 per share.

4.    Then on April 7, 2008, after the close of the market, Agria shocked investors when it announced that its auditors were unable to begin their audit of the Company's financial statements for 2007 due to various accounting and payment issues. The Company warned that "given the substantial delay in the commencement of the audit process, there is a risk that the Company may not be able to file its Annual Report" on time, and retracted its previously provided guidance for the fourth quarter of 2007, and first quarter and full year of 2008. The Company also announced that its Chief Operating Officer ("COO"), Defendant Zhixin Xue, had resigned. Further, the Company disclosed for the first time that its Chief Executive Officer ("CEO"), Defendant Guanglin Lai was actively involved in protracted compensation negotiations with the COO and other key executives. These executives stood to receive $18 million in cash and transfer of Company shares (which represented 22% of the Company) so as to "provide incentive for their continuing service and align their interests with those of the shareholders." As the Company noted, payment of cash and/or shares to the COO and other executives "as

2

compensation and incentive for their past and continuing services in connection with the proposed transaction will likely result in material compensation charges to the Company in the period in which the payment is made."

5.    Upon the release of this news, shares of the Company's securities declined $3.34 per share, or almost 38 percent, to close on April 8, 2008 at $5.46 per share, on unusually heavy trading volume. This closing price on April 8, 2008 represented a cumulative loss of $11.04, or 66.9 percent, of the value of the Company's shares at the time of its IPO just months prior.

6.    The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate the following: (1) that the Company had failed to secure enforceable employment agreements with its COO and other key executives prior to its IPO; (2) that the Company was in active negotiations with its COO and other key executives to provide multi-million dollar compensation packages in order to secure their future services (which were key to the Company's future success); (3) that these dramatically increased compensation expenses would materially impact the Company's financial results going forward, specifically by increasing its general and administrative expenses, and decreasing its operating profit and margins; (4) that, as a result of the above, the Company's financial results following its IPO would in no way be analogous to the financial statements provided in its Registration Statement; (5) that the failure of the Company to successfully negotiate enforceable employment agreements with its COO and other key executives would significantly affect its ability to execute its stated operating strategies due to the executives' critical importance to the Company; (6) that various accounting and payment issues, which existed at the time of the IPO, would subsequently prohibit the Company's auditors from completing its audit of the Company's financial statements; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of

3

the foregoing, the Company's Registration Statement was false and misleading at all relevant times.

7.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§ 77k and 77o].

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the New York Stock Exchange.

## PARTIES

12.     Plaintiff, Sandy Lodermeir, as set forth in the accompanying certification, incorporated by reference herein, purchased Agria's securities at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant Agria's principal executive offices are located at Room 706, 7th Floor,

4

Huantai Building, No 12A South Street, Zhongguancun Haidian District, Beijing, China. The Company has appointed Law Debenture Corporate Services Inc., 400 Madison Avenue, 4th Floor, New York, New York 10017, as its "agent upon whom process may be served in any action brought against us under the securities laws of the United States."

14.     Defendant Guanglin Lai ("Lai") was, at all relevant times, the Company's Co-CEO and Chairman of the Board of Directors. Defendant Lai is also the sole owner and a Director of Brothers Capital Limited ("Brothers Capital"), identified at ¶ 28, *supra*. Defendant Lai signed the Company's Registration Statement.

15.     Defendant Kenneth Hua Huang ("Huang") was, at all relevant times, the Company's Co-CEO. Defendant Huang signed the Company's Registration Statement.

16.     Defendant Gary Kim Ting Yeung ("Yeung") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and a member of the Board of Directors. Defendant Yeung signed the Company's Registration Statement.

17.     Defendant Zhaohua Qian ("Qian") was, at all relevant times, a member of the Company's Board of Directors. Defendant Qian is also a Director of Brothers Capital, identified at ¶28, *supra*. Defendant Qian signed the Company's Registration Statement.

18.     Defendant Zhixin Xue ("Xue") was, at all relevant times, the Company's COO and a member of the Company's Board of Directors until his resignation effective April 1, 2008. Defendant Xue signed the Company's Registration Statement.

19.     Defendant Geoffrey Duyk ("Duyk") was, at all relevant times, a member of the Company's Board of Directors. Defendant Duyk signed the Company's Registration Statement.

20.     Defendant Terry McCarthy ("McCarthy") is a member of the Company's Board of Directors and Chairman of its Audit Committee.

21.    Defendant Jasmine Marrero ("Marrero") was, at all relevant times, the Company's "Authorized U.S. Representative." Defendant Marrero is the manager of Law Debenture Corporate Services Inc., which is located at 400 Madison Avenue, Suite 4D, New York, New York. Defendant Marrero signed the Company's Registration Statement.

22.    Defendants Lai, Huang, Yeung, Qian, Xue, Duyk, McCarthy and Marrero collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Agria's reports, press releases, documents, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of Agria's IPO materials. Defendant Credit Suisse's executive offices are located at Eleven Madison Avenue, New York, New York.

24.    Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the

6

Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of Agria's IPO materials. Defendant HSBC's executive offices are located at 452 Fifth Avenue, New York, New York.

25.     Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of Agria's IPO materials. Defendant Piper Jaffray's executive offices are located at 800 Nicollet Mall, Minneapolis, Minnesota. Piper Jaffray has appointed CT Corporation System, located at 111 Eighth Avenue, New York, New York, as its registered agent.

26.     Defendant CIBC World Markets Corp. ("CIBC") was an underwriter of the Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of Agria's IPO materials. Defendant CIBC's executive offices are located at 300 Madison Avenue, New York, New York.

27.     Defendants Credit Suisse, HSBC, Piper Jaffray and CIBC are collectively referred to hereinafter as the "Underwriter Defendants."

28.     Defendant Brothers Capital is incorporated in the British Virgin Islands, and is located at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands. Defendant Brothers Capital was a selling shareholder in the Company's IPO, and sold approximately 10.3 million of the Company's shares into its IPO for gross proceeds of approximately $169.95 million. Defendant Brothers Capital is owned by Defendant Lai, and controlled by Defendants Lai and Qian.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Agria engages in the research and development, production, and sale of upstream

7

agricultural products in the People's Republic of China. The Company offers corn seeds, sheep

breeding products and seedling products to distributors.

30.    On November 6, 2007, the Company conducted its IPO. In connection with the

IPO, the Company filed a Registration Statement with the SEC. The IPO was a financial success

for the Company and its selling shareholder, Brothers Capital (controlled by Defendants Lai and

Qian), as they raised over $282 million by selling 17,150,000 of the Company's securities to

investors at a price of $16.50 per share. As the Company's press release stated:

> Agria Corporation ("Agria"), a fast-growing China-based agri-
> solutions provider engaged in research and development,
> production and sale of upstream agricultural products, today
> announced that it has priced its initial public offering of
> 17,150,000 American Depositary Shares (ADSs) at $16.50 per
> ADS. The ADSs, each representing two ordinary shares, will begin
> trading on Wednesday, November 7, 2007 on the New York Stock
> Exchange under the symbol "GRO".
>
> The offering comprises an initial public offering of 12,000,000
> ADSs by Agria and an additional offering of 5,150,000 ADSs by a
> selling shareholder of Agria disclosed in the prospectus. The
> underwriters have an option, exercisable for 30 days from the date
> of the prospectus, to purchase up to an additional 2,572,500 ADSs
> from Agria at the initial public offering price less the underwriting
> discounts and commissions to cover over-allotments of the ADSs.
>
> Credit Suisse acted as sole book runner for this offering, and
> HSBC, Piper Jaffray and CIBC World Markets acted as co-
> managers for the offering.

### Materially False and Misleading
### Statements Made in the Registration Statement

31.    Regarding the Company's description of itself, the Registration Statement, in

relevant part, stated:

> We are a fast-growing China-based agri-solutions provider
> engaged in research and development, production and sale of
> upstream agricultural products. We currently offer corn seeds,
> sheep breeding products and seedling products. Our goal is to
> become a leading provider of a variety of agricultural upstream
> products to meet evolving demands of other participants in the

8

agricultural industry, including producers of corn, sheep and other agricultural products that are used to manufacture products such as animal feed, mutton and wool. We have experienced substantial growth in revenues and profitability in recent years. Our total revenues increased from RMB 152.3 million in 2004 to RMB489.7 million ($64.3 million) in 2006, representing a compound annual growth rate, or CAGR, of 79.3%. Our net income increased from RMB57.8 million in 2004 to RMB253.9 million ($33.4 million) in 2006, representing a CAGR of 109.6%. In the six months ended June 30, 2007, we generated total revenues of RMB279.4 million ($36.7 million) and net income of RMB143.4 million ($18.8 million). In 2006, we achieved gross margins of 41.1%, 72.9% and 79.7% from our corn seed, sheep breeding and seedling segments, respectively, while revenues from our corn seeds, sheep breeding and seedling segments accounted for 50.2%, 39.4% and 10.4%, respectively, of our total revenues. In the six months ended June 30, 2007, revenues from our corn seeds, sheep breeding and seedling segments accounted for 47.9%, 39.6% and 12.5%, respectively, of our total revenues.

32.    As far as the Company's "strengths and strategies," the Registration Statement, in

relevant part, stated:

We believe that the following strengths have contributed to our current market position:

- fast-growing China-based agri-solutions provider;
- a diversified portfolio of commercially successful products;
- strategic locations and extensive local knowledge and experience;
- strong marketing and customer support and extensive distribution network;
- effective operations management and quality control system;
- strong research and development capabilities; and
- an experienced management team and skilled staff.

33.    With regard to the Company's risk factors, the Registration Statement, in relevant

part, stated:

*Our business depends substantially on the continuing efforts of*

9

*our management, and our business may be severely disrupted if we lose their services.*

Our future success depends significantly upon the continued services of our management, especially in the case of our primary operating entity, P3A. We rely on our management's experience in product development, business operations, and sales and marketing, and on their relationships with distributors and relevant government authorities. If one or more of our key management personnel are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all. The loss of the services of our key management personnel, in the absence of suitable replacements, could have a material adverse effect on our operations and financial condition, and we may incur additional expenses to recruit and train personnel. Each member of our management team has entered into an employment agreement with us, which contains confidentiality and non-competition provisions. If disputes arise between our management and us in light of the uncertainties within the PRC legal system, there is a risk that some of the provisions of these agreements may not be enforced or enforceable in China, where our managers reside and hold most of their assets.

34.     Additionally, regarding the risks related to the Company's shares being offered to

investors, the Registration Statement, in relevant part, stated:

*The market price for our ADSs may be volatile.*

The market price for our ADSs may be highly volatile and subject to wide fluctuations in response to factors including the following:

- announcements of technological or competitive developments;

- regulatory developments in our target markets affecting us, our customers or our competitors;

- actual or anticipated fluctuations in our quarterly operating results;

- changes in financial estimates by securities research analysts;

- changes in the economic performance or market valuations of other corn seed, sheep products or seedling companies;

- additions or departures of our executive officers and key personnel;

10

- fluctuations in the exchange rates between the U.S. dollar and RIB;

- release or expiration of lock-up or other transfer restrictions on our outstanding ADSs; and

- Sales or perceived sales of additional ADSs.

35.    Concerning the Company's operating expenses, the Registration Statement, in

relevant part, stated:

> *General and Administrative Expenses.* Our general and administrative expenses primarily consist of compensation and benefits for administrative, finance and human resources personnel, depreciation, provisions for bad debts, travel and other expenses associated with our corporate and administrative activities. We expect that our general and administrative expenses will increase as we add additional personnel and incur additional costs related to the growth of our business. We also expect to incur additional general and administrative expenses as a result of becoming a listed public company upon completion of this offering.
>
> * * *
>
> [Six Months Ended June 30, 2007 Compared to Six Months Ended June 30, 2006]
>
> *General and Administrative Expenses.* Our general and administrative expenses increased by 3.4% from RMB3.4 million in the six months ended June 30, 2006 to RMB3.6 million ($0.5 million) in the six months ended June 30, 2007. The increase resulted primarily from an increase of RMB2.0 million in professional service fees, salaries, traveling expenses and rental expenses related to the establishment of Agria Corporation and Agria China, partly offset by (1) a reversal of RMB1.2 million bad debt provision recorded in a previous period, as we subsequently collected the outstanding debts in full in the six months ended June 30, 2007 and (2) a decrease of RMB0.3 million in corporate expenses.
>
> * * *
>
> [Year Ended December 31, 2006 Compared to Year Ended December 31, 2005]
>
> *General and Administrative Expenses.* Our general and administrative expenses increased by 78.6% from RMB4.2 million in 2005 to RMB7.5 million ($1.0 million) in 2006. The increase resulted primarily from (1) an increase of RMB1.4 million in

corporate expense which was in line with the expansion of business; (2) an increase of RMB0.8 million in salaries and benefits for our administrative, finance and human resources personnel; and (3) an increase of RMB0.6 million in travel expenses.

* * *

[Year Ended December 31, 2005 Compared to Year Ended December 31, 2004]

*General and Administrative Expenses.* Our general and administrative expenses decreased by 30.2% from RMB6.0 million in 2004 to RMB4.2 million in 2005 primarily due to the one-time payment of RMB2.9 million to the former shareholders of P3A in 2004 in connection with our acquisition of P3A. The impact was partly offset by the increase of RMB 1.2 million in bad debt provision.

36.    As to the Company's "Competitive Strengths," the Registration Statement, in

relevant part, stated:

*Experienced Management Team and Skilled Staf.* Our management team has extensive experience in the agricultural industry in China, with a proven track record of developing and selling corn seeds, sheep breeding products and seedlings. Members of our management team include the vice chairman of the Food Research Institute of Shanxi, directors of the Sheep Breeding Association of China and a director of the Husbandry Association of China. Most of the members have worked together since 2003. We also employ a skilled staff with extensive experience in agriculture and husbandry industries. In addition, we plan to recruit qualified candidates with substantial experience in the global agricultural industry to further strengthen our senior management team.

37.    With regard to Defendant Xue, the Company's COO, the Registration Statement,

in relevant part, stated:

*Mr. Zhixin Xue* has served as our chief operating officer since June 2007 and as our director since August 2007. Mr. Xue is also the chairman of the board of P3A, our consolidated affiliated entity in China and has served in that position since 2000. Mr. Xue also serves as the chairman of the board of Taiyuan Relord, one of the former shareholders of P3A. Mr. Xue devotes approximately 80% of his time to attend to our business affairs. Mr. Xue was selected as one of the "National Outstanding Entrepreneurs" in 2005, was

12

named as one of the "Outstanding Entrepreneurs of Shanxi
Province" in 2005 and one of the "Outstanding Entrepreneurs of
Taiyuan" successively from 2002 to 2005 by the local
governments. Mr. Xue is a member of the Shanxi Committee of
the Chinese People's Political Consultative Conference, a political
advisory body in China. Mr. Xue holds a bachelor's degree in
medicine from Shanxi Medical College.

38.     Finally, regarding employment agreements purportedly in effect with the

Company's senior executive officers, the Registration Statement, in relevant part, stated:

We have entered into employment agreements with each of our
senior executive officers. We may terminate a senior executive
officer's employment for cause, at any time, without notice or
remuneration, for certain acts of the officer, including, but not
limited to, a conviction or plea of guilty to a felony, negligent or
dishonest acts to our detriment or misconduct or a failure to
perform agreed duties. A senior executive officer may, upon one-
month advance written notice, terminate his or her employment if
there is a material reduction in his or her authority, duties and
responsibilities, if there is a material reduction in his or her salary
or if such resignation is approved by our board of directors.
Furthermore, we may, upon advance written notice, terminate a
senior executive officer's employment at any time without cause.
Each senior executive officer is entitled to certain benefits upon
termination without cause as is expressly required by the
jurisdiction in which the executive is based.

39.     The statements contained in ¶¶ 31-38 were materially false and misleading when

made because defendants failed to disclose or indicate the following: (1) that the Company had

failed to secure enforceable employment agreements with its COO and other key executives

prior to its IPO; (2) that the Company was in active negotiations with its COO and other key

executives to provide multi-million dollar compensation packages in order to secure their future

services (which were key to the Company's future success); (3) that these dramatically increased

compensation expenses would materially impact the Company's financial results going forward,

specifically by increasing its general and administrative expenses, and decreasing its operating

profit and margins; (4) that, as a result of the above, the Company's financial results following its

13

IPO would in no way be analogous to the financial statements provided in its Registration Statement; (5) that the failure of the Company to successfully negotiate enforceable employment agreements with its COO and other key executives would significantly affect its ability to execute its stated operating strategies due to the executives' critical importance to the Company; (6) that various accounting and payment issues, which existed at the time of the IPO, would subsequently prohibit the Company's auditors from completing its audit of the Company's financial statements; (7) that the Company lacked adequate internal and financial controls; and (8) that, as a result of the foregoing, the Company's Registration Statement was false and misleading at all relevant times.

### The Truth Begins to Emerge

40.    On April 7, 2008, after the close of the market, Agria shocked investors when it issued a press release entitled "Zhixin (Frank) Xue Resigned as COO of Agria; Xue Will Remain Chairman of Primalights III Agriculture Development, Co., Ltd." Therein, the Company, in relevant part, stated:

> Agria Corporation (NYSE: GRO) (the "Company" or "Agria"), an innovative China-based agri-solutions provider, today *announced the resignation of Zhixin (Frank) Xue from his positions at the Company, effective April 1, 2008.* Prior to his resignation, Mr. Xue had served as the Company's chief operating officer ("COO") since June 2007 and as a director since August 2007. Mr. Xue will remain as the chairman and authorized legal representative of Primalights III Agriculture Development, Co., Ltd. ("P3A"), Agria's primary operating entity in China. Mr. Xue has indicated his intention to continue working with Agria in further developing P3A's business.
>
> On March 26, 2008, Mr. Xue informed the Company's Board of Directors (the "Board") that he intended to resign from his positions at the Company. Under the Company's corporate governance guidelines, the Board may accept or reject the resignation request of any director and/or officer. The Board rejected Mr. Xue's resignation request on March 31, 2008 and gave Mr. Xue 24 hours to make a final decision. Mr. Xue did not

14

respond to the Board within 24 hours. Consequently, effective April 1, 2008, Mr. Xue ceased to be the COO and a director of the Company.

*Mr. Xue is also the chairman and authorized legal representative of P3A and has been primarily responsible for the management of P3A 's operations since its inception in 2000.* Mr. Xue's positions at P3A remain unchanged.

The Board will begin the process of considering candidates to fill the COO position. There is *no assurance that the Company will be able to find a qualified COO easily or at all or that upon recruiting a new COO, such person will be able to work with members of P3A management effectively and successfully. In addition, if Mr. Xue and/or other management personnel of P3A decide to resign from P3A* in the future as a result of the conditions set forth by the Special Committee (as described below) or otherwise, *the loss of their services in the absence of suitable replacements would have a material adverse effect on the Company's business, financial condition and results of operations.* In such an event, the Company would also incur additional expenses to recruit and train new personnel.

*Separately, the Company's independent auditors have been unable to begin their audit of the Company's financial statements for 2007. Given the substantial delay in the commencement of the audit process, there is a risk that the Company may not be able to file its Annual Report on Form 20-F for the fiscal year ended December 31, 2007 by June 30, 2008. The Company is retracting its prior guidance for the fourth quarter of 2007 and first quarter and full year of 2008 as provided in a press release on February 25, 2008.*

I. P3A

*P3A is a consolidated affiliate of the Company* which conducts Agria's corn seed, sheep breeding and seedling businesses and holds the requisite licenses and permits for these businesses in China. P3A has four record shareholders, consisting of Ms. Juan Li who is the wife of Mr. Guanglin (Alan) Lai, Agria's chairman and co-CEO, and Mr. Zhaohua (Paul) Qian, a director of Agria, who together hold 70% of the equity interests of P3A, as well as Mr. Xue, and Mr. Mingshe Zhang who has been involved in the management of P3A, who together hold 30% of the equity interests of P3A. Agria's relationship with P3A and its shareholders is governed by the contractual arrangements entered into between Agria's wholly-owned subsidiary in China and P3A and its shareholders. *These contractual arrangements enable Agria to effectively control P3A and receive substantially all of P3A's*

15

*earnings and other economic benefits to the extent permissible under PRC law.* The Company believes that the contractual arrangements entered into between Agria's wholly-owned subsidiary in China and P3A and its equity shareholders are substantially similar to the contractual arrangements entered into by other China-based companies listed on U.S. stock exchanges engaged in businesses subject to restrictions on or prohibitions of foreign ownership in China. *The Company relies on all of P3A's shareholders to abide by the contract laws of China and honor their contracts with the Company. There is a risk that one or more of the shareholders of P3A may breach the existing contractual arrangements with the Company and not act in the best interests of the Company. If the Company cannot resolve any conflicts of interest between itself and any shareholder of P3A or if any shareholder breaches the existing contracts with the Company, the Company would have to resort to legal proceedings against such shareholder, which may result in disruption to the Company's business.* There is also substantial uncertainty as to the outcome of any such legal proceedings.

## II. Background of Resignation

In late January 2008, *the Board learned that Mr. Lai and Mr. Xue had been discussing payment of $18 million in cash and transfer of shares (which represent 22% of the Company) owned by Brothers Capital Limited ("BCL ") to Mr. Xue and certain members of P3A management designated by Mr. Xue,* including Mingshe Zhang, Lv Yan and Zhonglin Han, to be commensurate with their contribution to the Company and to provide equity incentive for their continuing service. BCL is solely owned by Mr. Guanglin (Alan) Lai, who is the husband of Ms. Juan Li. The payment of cash and transfer of shares by BCL to Mr. Xue and members of P3A management team is referred to in this disclosure as the "proposed transaction." Mr. Lai informed the Board that he would cause BCL to make the cash payment and transfer the shares, provided that Mr. Xue and members of P3A management would satisfy the conditions established by the Board for purposes of ensuring P3A management's continuing service and reinforcing the Company's control over P3A. *Mr. Lai informed the Board that he believed the proposed payment by BCL to Mr. Xue and members of P3A management team would provide incentive for their continuing service and align their interests with those of the shareholders of the Company. The Board was concerned about the potential adverse impact of the proposed transaction on the Company's business, financial condition and results of operations, as well as whether a similar situation may occur in the future.* On February 4, 2008, the Board approved a payment of $9 million by BCL to Mr. Xue and agreed to consider the proposed

16

transaction at a board meeting to be held in the near future. The Board also agreed to consider the payment of the remaining $9 million by BCL to Mr. Xue within 30 days after February 4, 2008 if certain conditions were met.

At a subsequent meeting in February 2008, the Board formed a Special Committee comprised of non-executive directors to evaluate the proposed transaction and set forth conditions to be met by Mr. Xue and members of P3A management team before the cash and shares from BCL would be released. At the same meeting, BCL agreed to deposit the remaining cash and shares into an escrow account administered by a third-party banking institution.

While the Special Committee was in the process of evaluating the proposed transaction, on March 5, 2008, *Mr. Xue informed the Board that he intended to resign from his positions as the Company's COO and director because he did not receive any response from the Special Committee and did not believe the Board or the Special Committee had the ability to resolve all important matters of the Company.* The English translation of Mr. Xue's e-mail to the Board is attached hereto as Exhibit A and is incorporated by reference herein. In accordance with the Company's corporate governance guidelines, the Board may accept or reject Mr. Xue's resignation request. Accordingly, on March 7, 2008, the Board rejected Mr. Xue's resignation request. Mr. Xue agreed with the Board's decision and withdrew his resignation request on March 8, 2008. Meanwhile, Mr. Xue requested that the proposed transaction between BCL and Mr. Xue and members of P3A management be consummated in the near future.

### III. Resignation

In March 2008, the Special Committee was actively discussing and finalizing the terms of the escrow agreement with BCL and considering and discussing the conditions to be met by Mr. Xue and members of P3A management team. On March 25, 2008, Mr. Xue asked the Board and the Special Committee about the status of the escrow account. On March 26, 2008, Mr. Xue missed the e-mail update regarding the status of the escrow account from the Special Committee and sent his resignation request via e-mail to the Board. In his e-mail to the Board, Mr. Xue indicated that he was disappointed with the fact that he had not received any written explanation from the Special Committee regarding the proposed transaction, and that he had not seen any concrete measures to ensure the consummation of the proposed transaction. At the request of the Special Committee, BCL placed the additional $9 million in cash and a signed blank share transfer form to transfer a total of 27,808,000 ordinary shares representing 22% of the total

17

issued and outstanding shares of the Company, into the escrow account on March 27, 2008. Under the escrow agreement entered into between BCL and the escrow agent, an independent third party, the escrow account will automatically terminate on the earlier of June 16, 2008, or at any time prior to June 16, 2008, upon written instructions from at least a majority of the Special Committee members, and only the Special Committee members may authorize the escrow agent to release the escrowed cash and share transfer form before the escrow account terminates. A copy of the escrow agreement will be filed as an exhibit to Form 6-K containing this announcement and be incorporated by reference therein. The escrow agreement is expected to be amended to extend the final termination date to June 20, 2008. On March 31, 2008, the Board informed Mr. Xue of its decision to reject Mr. Xue's resignation request in accordance with the Company's corporate governance guidelines and gave Mr. Xue 24 hours to make a final decision. Mr. Xue did not respond to the Board within 24 hours and therefore, Mr. Xue ceased to be the COO and a director of the Company on April 1, 2008. The English translation of Mr. Xue's e-mail to the Board is attached hereto as Exhibit B and is incorporated by reference herein. Mr. Xue was provided a copy of this press release.

**IV. Other Events**

*The Special Committee will continue to discuss conditions to be met by Mr. Xue and other members of the P3A management team before the proposed transaction can be consummated. Payment of cash and/or shares by BCL to Mr. Xue and members of P3A management as compensation and incentive for their past and continuing services in connection with the proposed transaction will likely result in material compensation charges to the Company in the period in which the payment is made.* However, these compensation charges are expected to be non-cash charges and non-dilutive to shareholders since the payment would be made by BCL, a major shareholder of the Company. [Emphasis added.]

41.    Also on April 7, 2008, the Company filed a 6-K with the SEC so as to file the

above press release. Attached as exhibits to the Company's 6-K were two emails from Defendant

Xue, which, in relevant part, stated:

**Exhibit A**

English Translation

Resignation Letter

Chairman, Directors and CEO,

Up to today (March 5, 2008), the Shanxi team have overcome many difficulties and fully fulfilled its responsibilities in accordance with the requirements of the Board of Directors. In the meantime, the Board of Agria has neither substantively or effectively enforced its decision made at the February 4, 2008 meeting involving the substantial interest of the Company nor fulfilled its promise with the binding timeline. ***The result of the above facts fully indicates that it has lost the trust of the Shanxi team, and also inevitably makes people question the seriousness of its decision and its ability to resolve all important internal and external matters of the Company.***

***Based on the facts including but not limited to the above, I also personally do not think that the current composition of the Board is reasonable, could effectively strengthen the Company's corporate governance or has the ability to make independent judgment, which makes it unable to fully protect the ultimate interests of the Company and all shareholders. As a result, I have requested many times orally or in writing to restructure the Board of Agria.***

After thorough and careful consideration, I have no reason to persuade myself to continue to serve as the director and senior management of the Company. In light of this, I hereby resign my position as the director and the COO of Agria, effective today, for which I only express my deep regret.

I hereby once again thank you everyone for your past cooperation and support at work.

Best regards,

Zhixin Xue

March 5, 2008

* * *

**Exhibit B**

English Translation

Chairman, Directors and CEO,

The March 25 deadline for Agria's Board of Directors and the Special Committee to solve the problem regarding the share and cash transfer to P3A team has passed. I didn't receive any formal written explanation from the Board or the Special Committee before such deadline as to why the promise wasn't fulfilled, nor did I receive any legally binding protection measures relating to the share and cash transfer under these circumstances. I am deeply

disappointed with this. In the meantime, *I have no doubt that Agria's Board needs to be restructured in order to strengthen the Company's corporate governance. I submitted my resignation request to the Board on March 5, 2008, but subsequently temporarily withdrew the resignation out of my respect for the Board and good wishes toward Agria. Now that the established facts have convinced me that my previous resignation was a right decision.* After careful consideration, I hereby announce that I resign my position as the director and the COO of Agria, effective immediately.

Best regards,

Zhixin Xue

March 26, 2008

[Emphasis added.]

42.     Later on April 7, 2008, *The Associated Press* published an article entitled "Agria

COO Resigns Over Payment Issues; Agria Shares Plunge Aftermarket, As COO Xue Resigns

Over Pay Issues; Company Retracts Outlook." The article, in relevant part, stated:

U. S.-listed shares of Agria Corp. plunged in Monday's aftermarket session, after the Chinese agricultural supplier said *Zhixin Xue resigned as chief operating officer, and warned that it may not be able to file its 2007 annual financial report on time.*

Xue, who has been p*rimarily responsible for management of the company's operations since 2000,* will remain chairman of Primalights III Agriculture Development Co. Ltd., the main entity through which Agria operates in China.

*Xue's resignation comes after the company's board learned in late January that Xue and Agria Chairman and co-CEO Guanglin Lai had discussed the payment of $18 million in cash and stock by a company shareholder, BCL, to Xue and other members of the management team as payment for their services and to serve as incentive for continued performance.*

The board approved $9 million of the sum, but put the remaining funds in escrow. Xue later resigned, contending that he wasn't informed of the board's action and wasn't convinced they would follow through with the deal.

The company said it rejected Xue's resignation request on March 31, but Xue didn't respond within a 24-hour window and his positions as COO and director thereby ended. Agria said its board will begin a search for his replacement, but warned that *if Xue or*

> *other management personnel decide to resign from Primalights,*
> *the loss of their services will materially hurt the company's*
> *operations.*
>
> *Separately, Agria said its independent auditors haven't been able*
> *to begin their audit of the company's financial statements for*
> *2007, and given this delay, Agria may not be able to file its*
> *annual report by June 30. The company retracted its prior*
> *guidance for the fourth quarter of 2007 and first quarter and full*
> *year of 2008.*
>
> In February, Agria said it expected to report fourth-quarter revenue
> of $31.8 million to $33.8 million and first-quarter sales of $17.9
> million.
>
> Shares plunged $3, or 34 percent, to $5.80 in aftermarket
> electronic trading, having closed the regular session up 12 cents at
> $8.80. [Emphasis added.]

43.     Upon the release of the Company's news, shares of the Company's securities

declined $3.34 per share, or almost 38%, to close on April 8, 2008 at $5.46 per share, on

unusually heavy trading volume. This closing price on April 8, 2008 represented a cumulative

loss of $11.04, or 66.9%, of the value of the Company's shares at the time of its IPO just months

prior.

44.     Later on April 8, 2008, *Bloomberg* published an article entitled "Agria Plunges

38% After Operating Chief Resigns." The article, in relevant part, stated:

> *Agria Corp. plunged 38 percent in New York trading after the*
> *Chinese provider of corn seeds retracted its earnings forecasts*
> *for the first quarter and 2008 and said Chief Operating Oficer*
> *Zhixin Xue had resigned.*
>
> The Beijing-based company's American depositary receipts, each
> representing two shares, fell $3.34 to $5.46 at 4:15 p.m. in New
> York Stock Exchange composite trading, the biggest decline since
> Agria sold shares to the public in November 2007.
>
> *Xue also is a shareholder and chairman of Primalights III*
> *Agriculture Development Co., known as P3A.* That company
> holds the licenses and permits for Agria's corn seed, sheep
> breeding and seedling businesses in China.
>
> Agria has contractual agreements with P3A shareholders that
> enable Agria to receive substantially all of P3A's earnings, Agria

21

said yesterday in a statement.

*"There is a risk that one or more of the shareholders of P3A may breach the existing contractual arrangements with the company and not act in the best interests of the company," Agria said in the statement.* [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Agria's securities pursuant to and/or traceable to the Company's November 6, 2007 IPO, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Agria's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Agria or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.    Plaintiff will fairly and adequately protect the interests of the members of the

22

Class and has retained counsel competent and experienced in class and securities litigation.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Agria; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

51.    The market for Agria's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Agria's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Agria's securities relying upon the integrity of the market price of Agria's securities and market information relating to Agria,

and have been damaged thereby.

52.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Agria's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

53.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Agria's financial well-being, business position, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Agria and its financial well-being, business position and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

54.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

55.    During the Class Period, Plaintiff and the Class purchased securities of Agria at artificially inflated prices and were damaged thereby. The price of Agria's securities significantly

declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

56.    At all relevant times, the market for Agria's securities was an efficient market for the following reasons, among others:

(a)    Agria securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Agria filed periodic public reports with the SEC and the NYSE;

(c)    Agria regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Agria was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

57.    As a result of the foregoing, the market for Agria's securities promptly digested current information regarding Agria from all publicly-available sources and reflected such information in Agria's securities price. Under these circumstances, all purchasers of Agria's securities during the Class Period suffered similar injury through their purchase of the

25

Company's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Agria who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 11 of
### The Securities Act Against All Defendants

59.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

60.    This claim is asserted by Plaintiff against all defendants by, and on behalf of,

26

persons who acquired shares of the Company's securities pursuant to and/or traceable to the false Registration Statement issued in connection with the November 6, 2007 IPO.

61.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Agria and controlling persons of the issuer, owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

62.     Underwriter Defendants owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

63.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

27

64.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

65.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Agria's securities sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Agria's securities pursuant to the Registration Statement.

66.     Agria is the issuer of the securities sold via the Registration Statement. As issuer of the securities, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

67.     At the times they obtained their shares of Agria, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

68.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

69.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violation of Section 15 of The Securities Act
### Against the Individual Defendants and Brothers Capital

28

70.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

71.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

72.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Agria within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Agria to engage in the acts described herein.

73.     Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

74.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  May 13, 2008

Respectfully submitted,

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**

By:
Marc I. Gross
Jeremy A. Lieberman
Fei-Lu Qian
100Park Avenue, 26th Floor
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
One North LaSalle Street, Suite 2225
Chicago, IL 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

*Attorneys for Plaintiff*

## Certification of Plaintiff
## Pursuant to Federal Securities Laws

1.    I, Sandy Lodermeier, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.    I have reviewed a Complaint against Agria Corporation. ("Agria"), and authorize a filing of a comparable complaint on my behalf.

3.    I did not purchase my Agria securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.    I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the Pomerantz Firm will exercise its discretion in determining whether to move on my behalf for appointment as lead plaintiff.

5.    To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Agria securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:


7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.    The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed __5-7-2008__ , at __Savage  minn.__
        (Date)                 (City, State)

__Sandy Lodermeier__
(Signature)

__Sandy Lodermeier__
(Type or Print Name)

## Summary of Purchases and Sales

| DATE | TRANSACTION TYPE: PURCHASE OR SALE | NUMBER/ TYPE OF SECURITY | PRICE OF SECURITY |
|---|---|---|---|
| 2-14-08 | purchase | 20 shares | 7.56 |
| 2-25-08 | purchase | 10 shares | 8.68 |
| 2-27-08 | purchase | 150 shares | 9.23 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |